Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

B. Parker Jones (OSB # 191163)
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence Street
Eugene, Oregon 97401
Tel: 541-344-3505
Email: parker@tebbuttlaw.com

Susan Jane M. Brown (OSB # 054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, OR. 97232
Tel: 503-914-1323
Email: brown@westernlaw.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, **OREGON WILD**, and **KLAMATH-SISKIYOU WILDLANDS CENTER**, Oregon non-profit corporations;<br><br>       Plaintiffs,<br><br>  vs.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT**, an administrative agency of the United States Department of Interior;<br><br>       Defendant. | Case No. 6:22-cv-204<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violations of National Environmental Policy Act; Federal Land Policy and Management Act; and Administrative Procedure Act) |

**INTRODUCTION**

1.      In 2020, Oregon experienced the most active fire season in recent history. Millions of acres of forestlands were burned and "post-fire logging" – also called salvage logging – in the wake of the fires has occurred at a tremendous pace.

2.      While the Bureau of Land Management's ("BLM") governing 2016 Northwestern and Coastal Oregon Resource Management Plan ("2016 RMP") directs the agency to conduct post-fire logging in areas designated for timber production, the amount of salvage logging contemplated and planned for under the 2016 RMP was minimal. The 2016 RMP's Biological Assessment assumed there would be 1,737 acres of salvage logging total across the entire RMP planning area from 2013-2063. Here, the BLM, through the Archie Creek Fire Salvage and Hazard Tree Removal Project ("Archie Creek Project"), has authorized the post-fire logging of 12,562 acres to occur over the next two years, well over six times what was modeled and planned for over the entire 50-year life span of the 2016 RMP.

3.      Instead of taking the requisite hard look at the environmental impacts associated with such a dramatic departure from what was contemplated under the 2016 RMP, BLM published an Environmental Assessment ("EA") for the Archie Creek Project that minimized the analysis of environmental impacts required by the National Environmental Policy Act ("NEPA").

4.      The Archie Creek Fire Salvage Harvest and Hazard Tree Removal Environmental Assessment EA only considers two issues in detail: (1) the economic benefits associated with post-fire logging, and (2) effects to soil and water quality. By narrowing the scope of the EA to these two issues, the BLM proactively eliminated a host of other social and environmental impacts from consideration in determining whether or not this project would have significant environmental impact that warranted full analysis under an Environmental Impact Statement

("EIS"). Additionally, the agency has failed to comply with its obligation to consider opposing scientific viewpoints, including those raised by Plaintiffs that contradict the many assumptions made by the BLM in the EA.

5.      The BLM's failure to consider the effects to the northern spotted owl are particularly significant given that the record-setting 2020 fires dramatically impacted spotted owls in the region. Fifty-four (54) spotted owl home ranges overlap the project area, and 13,851 acres of spotted owl nesting, roosting, and foraging habitat burned at moderate to high severity. Spotted owls generally continue to occupy their home ranges after wildfire for some period of time, but specific spotted owls' use of burned areas that were previously used for nesting, roosting, and/or foraging depends on the complex interaction of factors such as habitat quality pre-and post- fire, location of the burns in relation to spotted owl core-use areas, and the size, severity, and patterns of the burn. Regardless, post-fire logging can negatively affect owl use of these areas and exacerbate any negative effects associated with high-severity wildfires. The BLM's failure to take a hard look at the impacts of this extensive logging is illegal.

6.      Under the 2016 RMP, the BLM is not permitted to "take" or adversely modify occupied northern spotted owl habitat. The logging levels modeled and planned for under the RMP were designed to accomplish this goal. Following fires, spotted owls shift their site centers, often enlarging the sizes of their home ranges, or use areas, to encompass the best available habitats, or in some cases completely vacate the burned site. Despite the likely shifting of spotted owl sites following the 2020 fires, the BLM has not conducted post-fire owl surveys and is instead relying upon "the quality and distribution of federally-managed habitats" to derive spotted owl use and occupancy.

7.      According to the U.S. Fish and Wildlife Service, the BLM has authorized the modification or removal of 1,463 acres of unburned northern spotted owl nesting, roosting, and foraging habitat, 2,685 acres of owl dispersal habitat, and the removal of 1,726 acres of nesting, roosting, and foraging habitat that burned at moderate or high severity, which the agency admits still functions as owl habitat. Of the 12,644 acres of the proposed logging, approximately 9,261 acres are in designated spotted owl critical habitat. Given the species' precipitous ongoing decline in this region, removing this amount of owl habitat is significant.

8.      Additionally, there is much the BLM has yet to fully analyze and account for following the 2020 fires. Owl sites occupied prior to the fires have not been surveyed and BLM presumes they are non-viable, but the extent and degree of fire damage has not been surveyed on the ground.

9.      Moreover, the BLM failed to take a hard look at or even consider impacts to federally listed fish species.

10.     Many of the assumptions made by the BLM are wrong, contradict themselves, or conflict with prevailing scientific opinions. By abbreviating the scale of its EA, the BLM has also ignored many protective provisions and applicable management directions in the RMP that also bear on the project and its impacts.

11.     Courts in this circuit have repeatedly held that projects of this scope, which have a myriad of environmental impacts, and which also include unknown or uncertain impacts, require analysis under a full EIS.

12.     Accordingly, Plaintiffs Cascadia Wildlands, Oregon Wild, and Klamath Siskiyou Wildlands Center (collectively "Plaintiffs"), bring this civil action arising under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701 *et seq*. Plaintiffs challenge the BLM's

issuance of the Archie Creek Fire Salvage Harvest and Hazard Tree Removal Environmental

Assessment, Finding of No Significant Impact ("FONSI") and Decision Record ("DR") for

violations of federal laws and regulations intended to protect the public's natural resources and

ensure informed, well-reasoned decision-making.

13.     This action seeks a declaration that the BLM violated the Federal Land Policy and

Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*;., and the National Environmental

Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and these statute's implementing regulations by

(a) failing to prepare an Environmental Impact Statement ("EIS"), (b) failing to take a hard look

at environmental impacts, and (c) conducting prohibited salvage logging within designated

reserves.

14.     The requested relief is necessary to preserve the status quo, prevent illegal agency action,

and forestall irreparable injury to the environment.

15.     If Plaintiffs are the prevailing party in this action, they will seek an award of fees and

costs pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201

(injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant).

17.     This cause of action arises under the laws of the United States, including the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.; the Federal Land Policy and

Management Act, 43 U.S.C. §§ 1701 *et seq*; and the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321 *et seq*. Additionally, an actual, justiciable controversy exists

between Plaintiffs and Defendant. Thus, the requested relief is proper under 28 U.S.C. §§ 2201-

02 and 5 U.S.C. §§ 701-06.

18.     Venue is proper under 26 U.S.C. § 1391. All, or a substantial part, of the events or omissions giving rise to the claims herein occurred in this judicial district. Plaintiffs and Defendant reside in this district. The public lands and resources at issue are located in this district.

19.     This case is filed properly in Eugene, Oregon pursuant to Local Rules 3.3 and 3.4 because the Archie Creek Project pertains to public lands located in Douglas County, Oregon.

## PARTIES

20.     Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion.

21.     Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's wild lands, wildlife, and waters as an enduring legacy.

22.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a 501(c)(3) Oregon non-profit corporation based in Ashland, Oregon, dedicated to the preservation and restoration of biological diversity in the Klamath-Siskiyou region of southwestern Oregon and northern California. KS Wild is committed to the ecological and biological integrity of late-successional forests and aquatic ecosystems in the region. Specifically, KS Wild has been

PAGE 6 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

heavily invested in the recovery of the northern spotted owl, a species dependent on the older forests of this region. KS Wild members and staff use and enjoy the public lands proposed for logging in the Archie Creek Project area for dispersed recreation, wildlands studies, and to satisfy our human need for direct experience with primary forests. KS Wild members hike, camp, bird watch, identify plants, and otherwise learn from the terrestrial and aquatic ecosystems in the project area where the timber sales are proposed. KS Wild and its members wish to recreate under an intact forest canopy, hear songbirds, encounter rare plants and animals, enjoy clear healthy streams, and experience unadulterated forest ecosystems. KS Wild and its members will be directly harmed by the BLM's timber sale activities within the project area. KS Wild also has an organizational interest in providing its members and the general public with information that NEPA requires the BLM to compile and disclose in its environmental documents. Members and staff of KS Wild enjoy reviewing these documents, understanding the agency's data and conclusions, and are very concerned with the environmental costs and tradeoffs involved in site-specific resource management decisions such as the one to log post-fire forests via the Archie Creek Project timber sales. These interests are adversely impacted by the BLM's failure to comply with NEPA.

23.    All Plaintiffs have organizational interests in the proper and lawful management of the Roseburg District of the BLM's public lands. First, Plaintiffs' aesthetic, recreational, scientific, economic, and spiritual interests will be adversely affected and irreparably injured if Defendant engages in activities detrimental to forest ecosystems and late successional habitat in the project area. Second, Plaintiffs' and their members' use and enjoyment of the Archie Creek Project area will be irreparably degraded and impaired if the Project is implemented as planned.

24.     Additionally, Plaintiffs' injuries are predicated on unlawful BLM actions that have: (1) facilitated the risk of unsupported and uninformed management and decision-making; (2) increased the risk of actual, threatened, and imminent environmental harm; and (3) created actual, concrete injuries to Plaintiffs and their interests.

25.     Plaintiffs seek to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the Archie Creek Project area and the threatened or endangered species that occupy it. Thus, Plaintiffs' injuries would be redressed by the relief sought.

26.     Plaintiffs submitted timely written comments on the Archie Creek Project at all stages of the NEPA process. Plaintiffs have exhausted their administrative remedies.

27.     Defendant BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the United States Department of Interior and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations.

## STATEMENT OF LAW

### Administrative Procedure Act

28.     The Administrative Procedure Act ("APA") confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

### National Environmental Policy Act

29.     In 1969, Congress directed all federal agencies to assess the environmental impacts of proposed actions that have the potential to significantly affect the quality of the environment through the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2)(C). NEPA's

disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to meaningfully participate in the decision-making process.

30.    The Council on Environmental Quality ("CEQ") promulgated uniform regulations for implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342, 40 C.F.R. §§ 1500 *et. seq.* (1978).

31.    NEPA requires federal agencies to prepare, consider, and approve an adequate Environmental Impact Statement ("EIS") for "any major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4(a)(1) (1978).

32.    To determine whether an action requires an EIS as required by NEPA, an action agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b) (1978). An EA should be a concise public document that briefly describes the proposal, examines reasonable alternatives, considers environmental impacts, and provides a listing of individuals and agencies consulted. 40 C.F.R. § 1508.9 (1978). After preparing an EA, the agency will either issue a Finding of No Significance or prepare an EIS. If the agency decides that an EIS is not needed, it must undertake a thorough environmental analysis and supply a convincing statement of reasons that explains why a project's impacts are not significant.

33.    To make a rational determination of non-significance, NEPA documents must consider the proposed action's direct, indirect, and cumulative environmental impacts. 40 C.F.R. § 1508.8 (1978). Direct impacts are caused by the action and occur at the same time and place as the proposed project. *Id.* § 1508.8(a) (1978). Indirect impacts are caused by the action and are later in time or farther removed in distance but still reasonably foreseeable. *Id.* § 1508.8(b) (1978). Both types of impacts include "effects on natural resources and on the components, structures,

and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." *Id.* § 1508 (1978). Cumulative impacts result when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. *Id.* § 1508.7 (1978).

34.     Finally, NEPA requires federal agencies to release environmental information to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b) (1978). The information released must be of high quality and sufficient so the public can question the agency's rationale and understand the agency's decision-making process. *Id.*

*Federal Land Policy and Management Act*

35.     Congress enacted the Federal Land Policy and Management Act ("FLPMA") in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq*. Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress expressed its belief that our public land should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

36.     FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMP") that govern the use of the land it manages. 43 U.S.C. § 1712. Once a land use plan has been developed, the BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

37.     The Archie Creek Salvage Harvest and Hazard Tree Removal project was developed

under the 2016 Northwestern and Coastal Oregon Record of Decision and Resource

Management Plan ("2016 RMP"). The 2016 RMP provides specific management directions for

timber salvage in the various land use allocations.

*2016 Northwestern and Coastal Oregon Record of Decision*
*and Resource Management Plan*

38.     The 2016 RMP provides overall direction for all resources on BLM-administered lands in

Western Oregon, including the lands at issue here. The overall purpose of the 2016 RMP is in

relevant part to provide a sustained yield of timber, contribute to the conservation and recovery

of threatened and endangered species, provide clean water in watersheds, and restore fire-

adapted ecosystems. The 2016 RMP provides this direction through different designated land use

allocations which have different management objectives and management direction. The

management directions in the 2016 RMP identify what future actions may or may not be allowed

within the different land use allocations.

39.     The relevant land use allocations here are the Harvest Land Base, Late Successional

Reserves, and Riparian Reserves.

40.     The Harvest Land Base's ("HLB") management objectives include offering for sale the

declared Allowable Sale Quantity ("ASQ") of timber. The ASQ represents the sustained-yield

volume of timber that the BLM can offer for sale. The BLM is required to make the

determination of the ASQ accounting in compliance with other laws and with consideration of

the objectives, land use allocations, and management directions of the RMP.

41.     The HLB is divided into two sub-allocations, Low Intensity Timber Areas ("LITA") and

Moderate Intensity Timber Areas ("MITA"). In both allocations, the BLM is instructed to

implement timber salvage harvest after disturbance events to recover economic value and to

minimize commercial loss or deterioration of damaged trees where the BLM determines that removal is economically viable. Within the MITA, post-fire logging must leave 5 percent of the pre-harvest stand basal area in live trees or snags in individual harvest units and at least 15 percent of the pre-harvest stand basal area in live trees or snags in individual harvest units with the LITA.

42.     The BLM's primary management objectives for the Late Successional Reserves ("LSRs") are to maintain nesting-roosting habitat for the northern spotted owl and to promote the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern spotted owl. The BLM is required to follow its management direction within the 2016 RMP and allowable use restrictions for LSRs, such as maintaining nesting-roosting habitat function, regardless of northern spotted owl occupancy.

43.     The BLM's primary management objective for Riparian Reserves is to contribute to the conservation and recovery of ESA-listed fish species and their habitats. The BLM is required to follow its management direction within the 2016 RMP and allowable use restrictions for Riparian Reserves, such as prohibiting yarding corridors, skid trails, and road maintenance unless there is not operationally feasible and economically viable alternative to accomplish other resource management objective.

44.     Yarding corridors/wedges are landing areas where cut logs are moved and stored. Yarding corridors are primarily used for cable yarding but may be used for ground-based yarding in situations where logical road locations cannot be constructed to a landing within the unit. All land use allocations contain management directions which specifically describe where yarding corridors are allowed and for what purposes.

## STATEMENT OF FACTS

*Archie Creek Fire*

45.     The Archie Creek Fire started on September 8, 2020, and burned 131,504 acres,

including 39,900 acres of BLM forest lands. The fire started in part on lands managed by the

Roseburg District BLM, quickly combined with a fire on nearby Umpqua National Forest lands,

and rapidly spread throughout nearby commercial forest lands and intermingled residences. The

fire's behavior was characterized as extreme.

46.     In total, over 2,100 residents were evacuated, and 109 houses destroyed.

47.     The fire was declared contained on November 16, 2020.

48.     The Archie Creek Fire was one of multiple large fires that burned extensively through

western Oregon during the late summer and fall of 2020.

49.     Within the overall 131,504-acre Archie Creek Fire perimeter, an estimated 33 percent

burned at high severity, 44 percent at moderate severity, 14 percent at low severity, and 9 percent

was classified as unburned or experienced very low severity burn.

50.     The BLM estimates that 50 percent of the areas affected by the Archie Creek Fire in the

Project analysis area burned at high severity, 3 percent at moderate severity, 19 percent at mixed

severity, and 28 percent at low/unburned severity.

51.     The incidence of high severity fire can be attributed to that fact that 69 percent of the

affected analysis area is owned by private and commercial timber companies, where forests are

maintained as even-aged plantations managed on a 40–60-year harvest rotation and are

intermixed with federal lands in a checkerboard pattern. Research has consistently shown that

these young, homogenous, and intensively managed forests are more susceptible to high fire

severity than forests on nearby public lands, which tend to have more varied tree species and structure, including much older trees.

52.     In areas where the fire burned at moderate to high severity, the fire created complex early seral stands, which the BLM has previously determined was lacking across the landscape given past forest management and ongoing fire suppression practices.

53.     The fire also created down wood and snags, or standing dead trees or damaged trees that will die over the next 10-20 years and provide important wildlife habitat for older forest species.

54.     The fire also affected soils.

55.     Soil burn severity ("SBS") is the primary characteristic driving post-fire soil erosion response and sediment delivery. Within the Archie Creek Fire burned area, 73% of areas experienced high and moderate SBS. Across this area, the BLM identified long-term soil productivity as a critical value with a high risk of damage or loss. The BLM made this determination because there is an elevated risk of instability in the form of rockfall and debris flows across much of the burned area.

56.     The cumulative risk of various types of erosion is high along many slopes and drainages in and below the burned area following the Archie Creek Fire. The primary watershed responses are expected to include an initial flush of ash and burned materials, erosion in drainages and on steep slopes in the burned area, increased peak flows and sediment transport and deposition, and debris flows. These responses will likely lead to increased water quality concerns for municipal and domestic drinking water providers within and downstream of the fire, as well as aquatic organisms and their habitat.

*Archie Creek Project*

57.    The Archie Creek Salvage Harvest and Hazard Tree Removal Project ("Archie Creek

Project" or the "Project") authorizes treatment of 12,562 acres across a 22,000-acre project area.

This includes the logging of 6,564 acres of forest in salvage units, plus over 3,677 acres of

hazard-tree logging in Riparian Reserves and LSRs.

58.    The Archie Creek Project is the largest post-fire area salvage logging project in Oregon

following the 2020 fires. The forests targeted for logging are up to 160 years in age, including

never-before-logged native, mature forests with trees several feet in diameter.

59.    Approximately 55 percent of the Archie Creek Project area is within the Wildland

Development Area ("WDA"), or more commonly referred to as Wildland Urban Interface. The

WDA is the zone of transition between structures and human development meet wildland and

vegetative fuels. The magnitude of human-caused ignitions within this area increases

significantly, as does the risk to human life and property from wildfire. There are several homes

directly adjacent to the Archie Creek Project area as well as highways and transmission lines.

60.    The 22,000-acre Archie Creek Project area spans across 6 different watersheds and

includes the designated Wild and Scenic River Corridor for the North Umpqua River.

61.    The majority of the proposed logging occurs in the HLB land use allocation. The

proposed logging will retain the minimum number of trees required under the 2016 RMP: "5

percent of the pre-harvest stand basal area in live trees or snags in individual harvest units for

HLB Moderate Intensity Timber Area ('MITA') and at least 15 percent of the pre-harvest stand

basal area in live trees or snags in individual harvest units for HLB Low Intensity Timber Area

('LITA')."

62.    The Archie Creek Project includes 2,024 acres of logging in LSR land use allocation, where again the BLM's primary management objectives are to maintain nesting-roosting habitat for the northern spotted owl and to promote the development and maintenance of foraging habitat for the northern spotted owl.

63.    The Archie Creek Project includes 1,111 acres of logging in Riparian Reserve land use allocation where again the primary objective is to contribute to the conservation and recovery of ESA-listed fish species and their habitats.

64.    The annual timber target or ASQ for the Roseburg District is 32 million board feet ("MMbf"). The Archie Creek Project is anticipated to generate 40 MMbf per year for fiscal year 2021 and 45 MMbf for fiscal year 2022. The Archie Creek Project is predicted to exceed the ASQ by 8-13 MMbf per year, going far beyond what the BLM previously determined was sustainable and lawful.

65.    The Project will also involve the construction of approximately 12 new miles of roads, and 57 landings along this road construction. The roads will be 14 feet wide with an average clearing of 40 feet on each side of the road. Timber haul on these newly constructed roads will occur during the wet and dry season. Roads will be constructed through LSR and Riparian Reserve allocations.

66.    The Project involves the construction of yarding corridors/wedges outside of the salvage harvest units based on limited access or operational needs due to topography, including construction of yarding corridors on 53 acres in the LSR land use allocations. All trees within these corridors will be cut and removed, removing all of the forest canopy from these yarding corridors. Yarding corridors constructed in Riparian Reserves will be used for ground-based logging.

67.    Plaintiffs submitted scoping comments on the Project on January 18, 2021. Plaintiffs raised concerns with the sheer volume of logging on recently burned and vulnerable soils above the North Umpqua River. Plaintiffs raised concerns with salvage logging and associated activities that included but were not limited to: adverse environmental effects on reserves, late-successional forest ecosystems, the North Umpqua River and its many tributaries, the northern spotted owl, Oregon Coast coho salmon, future fire risk and hazard, road-related ecological effects, aquatic species, Pacific fisher, summer instream flows, soils, noxious weed spread, snags and desired levels of downed woody debris, carbon sequestration and storage, imperiled and sensitive botanical species, the surrounding communities, and unique and important recreation and cultural areas; the science highlighting the adverse ecological effects of salvage logging; the scientific controversy surrounding owl use and occupancy of post-fire forests; the BLM's definition of burned areas and including moderate and severely burned areas together for logging purposes; and cumulative impacts with other ongoing salvage logging activities, particularly on nearby private land. Plaintiffs specifically requested that the BLM develop an EIS so that these issues could be addressed in detail.

68.    The BLM ignored Plaintiffs' request and finalized an abbreviated EA in early August 2021. The BLM released the final EA on August 16, 2021. The BLM issued final decisions that same day for three different timber sales implementing the Project. These decisions were issued "full force and effect," meaning that the decision took effect immediately and exempted the project from administrative review of the decision.

69.    Only two issues were identified for detailed analysis in the EA: (1) how the proposed salvage logging would affect recovery of economic value from timber harvest following a

disturbance event and contribute towards the achievement of the ASQ for the Roseburg District, and (2) how vegetation management would affect soils and water quality.

70.    The EA contains an extensive list of issues not analyzed in detail in a 41-page Appendix. The issues not analyzed in detail in the EA include but are not limited to effects on: (1) the northern spotted owl and its critical habitat; (2) BLM Bureau Sensitive Species and their habitats; (3) hunting and big game species; (4) special status botanical species; (5) noxious weed spread; (6) recreation; (7) views or visual resources; (8) cultural resources; (9) future fire hazard and risk; (10) carbon sequestration and storage; (11) slope stability and landslide risk; (12) streamflow; (13) all aquatic species including Oregon Coast coho salmon and its critical habitat and designated Essential Fish Habitat; and (14) the North Umpqua Wild and Scenic River Corridor.

71.    The BLM disregarded compliance with numerous applicable standards in the 2016 RMP that pertain to many of the issues the BLM dismissed from detailed consideration.

*Soil and Water Quality*

72.    The Archie Creek Project will cause detrimental soil disturbance through soil compaction, displacement, loss of organic matter, and subsequent soil erosion. Soil erosion and runoff from the Project will increase sediment loading in the creeks, streams, rivers, and water in the Project area. The BLM does not analyze or disclose the impact of the increases in sediment from logging and road construction on water quality or fisheries habitat, such as Oregon Coast coho salmon habitat.

73.    The Archie Creek Fire largely burned at high and moderate soil burn severity. The Archie Creek Fire modified the existing baseline for soil conditions. The BLM does not disclose or analyze the new baseline soil conditions in the Archie Creek EA.

74.     Post-fire soil conditions are vulnerable to surface erosion. Surface erosion leads to long-term declines in soil productivity and impacts to water quality, including but not limited to, increased sediment loading and turbidity. Wildfires increase the susceptibility of soils to erosion. Higher severity fires increase the erosion potential by several orders of magnitude. Approximately half of the area the BLM proposes to log has an erosion hazard rating as moderate while the other half has an erosion hazard rating as severe or very severe.

75.     Moderate to high severity fires can produce peak flows (i.e., high river and stream flows) that are 5- to 870-times larger than those peak flows in unburned areas. Tree and canopy removal reduces water storage. These hydrologic changes lead to increased annual and partial duration peak flows. As a result of the Archie Creek Fire, streams are expected to exhibit higher peak flow rates (200-210 percent of normal) and a much greater amount of sediment and debris delivery.

76.     The Archie Creek Project planning area already contains legacy ground disturbance from past timber harvest operations. Most landings and roads are highly compacted with no soil cover.

77.     Post-fire logging activities further increase soil erosion and post-fire runoff. Ground based harvest contributes the highest soil disturbance as skidding logs across bare soil disturbs and compacts the already damaged soil. The BLM proposes ground-based logging on approximately 1,715 acres of moderate or high burn severity soil. The BLM does not accurately analyze or disclose anticipated adverse soil impacts. The BLM instead bases its soil impact analysis on pre-fire monitoring data. The BLM does not disclose or analyze the additional sediment loading from the timber harvest activities on 12,562 acres of post-fire soils.

78.    Road construction also increases erosion and sediment delivery to waterways. The BLM does not disclose or analyze the additional sediment loading from road construction or the resulting impacts to water quality or fisheries habitat.

79.    The BLM acknowledges that past timber activities have contributed to increased soil disturbance, erosion, and sedimentation. The BLM acknowledges that 66,916 acres of salvage logging on nearby private land has occurred, is occurring, or is likely to occur in the future. The BLM does not analyze or disclose the effects of the cumulative sediment loading from federal and non-federal timber harvest in the same watersheds.

*Oregon Coast Coho Salmon*

80.    Oregon Coast coho salmon is a species listed as threatened under the Endangered Species Act, which means that the species is likely to become at risk of extinction within the foreseeable future. To protect species listed under the Endangered Species Act, federal agencies designate critical habitat for the species that encompasses areas essential to the conservation of the species and which requires special management considerations. The BLM is required to analyze and disclose potential impacts to listed species and their designated critical habitat as these impacts inform determinations of whether or not a project will have a significant impact on the environment and warrant preparation of a full EIS or additional mitigation.

81.    The Archie Creek Project area encompasses numerous waterbodies identified as critical habitat for Oregon Coast coho salmon. Historic and ongoing timber harvest activities have been identified as a significant factor in the degradation of Oregon Coast coho salmon habitat. Historic and ongoing timber harvests and associated road building have reduced stream shade, increased fine sediment, and altered watershed hydrology. The Archie Creek Project will contribute increased sediment to rivers, creeks, and streams within the project area. The Archie

Creek Project will contribute increased sediment to Oregon Coast coho salmon critical habitat. The Archie Creek Project will adversely affect Oregon Coast coho salmon.

82.    The Archie Creek Project authorizes timber harvest activities on approximately 12,562 acres of post-fire soil and construction of 12 miles of new roads. The Archie Creek Project authorizes logging in Riparian Reserves. The Archie Creek Project authorizes yarding corridors in Riparian Reserves.

83.    The availability of quality spawning substrate is critical to Oregon Coast coho salmon habitat and productivity. Spawning habitat suitability depends on the amount, size, and quality of the substrate. Increased sediment loading increases the possibility of embryo suffocation, entombment, and disease, generally decreases habitat value for reproduction. Accumulation of sediment also reduces the availability of macroinvertebrates, an important food source for salmonids, which in turn influences salmonid growth and survival. Suspended sediment (turbidity) in the water column affects visibility, foraging ability, and breathing capacity in salmon.

84.    Fire impacts on soils and forest cover will increase peak flows laden with debris leading to an increase in accelerated channel scour and hillslope erosional processes, increase in fine sediment leading to direct mortality of eggs and fry and decrease of habitat elements such as pools, and increase in the likelihood of other negative effects to habitat from increased flow interaction with infrastructure, such as roads, culverts, and bridges.

85.    The BLM failed to analyze and disclose the effects of the Archie Creek Project on Oregon Coast coho salmon. The BLM falsely claimed the Archie Creek Project will have no measurable effects on fish or aquatic habitat. The BLM asserted this claim based on prior analysis from the Horse Prairie Fire Recovery Plan EA and the Rabbit Mountain Fire LSR

Recovery EA, two prior projects. The BLM claimed the Horse Prairie Fire Recovery Plan EA and the Rabbit Mountain Fire LSR Recovery EA are similar proposed actions, but offered no support for this statement.

86.    In fact, the Horse Prairie Fire Recovery Plan EA ("Horse Prairie Project") is not similar to the Archie Creek Project. The Horse Prairie Project only proposed approximately 400 acres of logging. The Horse Prairie Project did not include any timber harvest in Riparian Reserves. The Horse Prairie Fire created only low burn severity along riparian areas and fish bearing streams.

87.    Neither is the Rabbit Mountain Fire LSR Recovery EA ("Rabbit Fire Project") similar to the Archie Creek Project. The Rabbit Fire Project did not include any salvage logging. The Rabbit Fire Project included approximately 1400 acres of tree planting and no timber harvest. The Rabbit Fire Project proposed road decommissioning, not construction of new roads. Few areas within the Rabbit Mountain Fire exhibited moderate to high burn severity.

88.    The BLM admits "[t]he Archie Creek Fire was a rare disturbance event that resulted in nearly a 100 percent loss of all vegetation in most of the BLM lands within the fire perimeter. . . As a result of the fire, storm response flows are expected to have higher peak flow rates (200-2100 percent of normal) and a much greater amount of sediment and debris delivery." The BLM failed to analyze or disclose the effects of sediment loading from the Archie Creek Fire in conjunction with fire-generated sediment loading on Oregon Coast coho salmon.

89.    The Archie Creek Project will exacerbate enhanced soil runoff and sediment loading to streams. The BLM made no attempt to analyze the additional sediment loading from the Archie Creek Project. The BLM failed to analyze or disclose the effects on Oregon Coast coho habitat as a result of the increased sediment from the Archie Creek Project's logging and road construction. The BLM failed to analyze or disclose the cumulative effects on Oregon Coast

coho salmon of additional sediment loading from the Archie Creek Fire, the Archie Creek

Project, and 66,916 acres of salvage logging on nearby private land that has occurred, is

occurring, or is likely to occur in the future.

*Northern Spotted Owl*

90.     The Archie Creek Project area occurs within an area specifically noted as an important

area for spotted owl conservation by the U.S. Fish and Wildlife Service ("FWS"), and an area

that has historically functioned as a source population of owls for other nearby areas. The

intended function of this area is to support high quality spotted owl nesting, roosting, and

foraging and dispersal habitats. Northern spotted owl nesting, roosting, and foraging habitat

consists of physical and biological features that include, but are not limited to: 1) nesting – sites

for breeding, reproduction, and rearing of offspring; 2) roosting – habitat or shelter; and 3)

foraging – food, water, or other nutritional or physiological requirements. Dispersal habitat are

forest stands with structural characteristics that allow for the movement of young spotted owls

from nesting sites to new breeding sites.

91.     The FWS has previously determined that this area specifically is threatened by ongoing

habitat loss and that threats from high-severity fires may potentially weaken the influence of this

area as a source population. Post-fire logging exacerbates the negative impacts to owls from

wildfires.

92.     The FWS formally reviewed the Archie Creek Project's impacts on the northern spotted

owl through a Biological Opinion dated August 5, 2021. While the FWS determined that the

project would not jeopardize the continued existence of the entire species, the agency determined

that adverse effects to spotted owls and their designated critical habitat are anticipated from this

proposed action.

93.     The Archie Creek Project includes 12,562 acres of logging. This includes 6,540 acres of post-fire logging salvage logging and 1,463 acres of green tree logging. Approximately 9,261 acres of the proposed logging is within designated spotted owl critical habitat, again habitat essential for the conservation of the species.

94.     The project area is occupied by northern spotted owls. Logging units within the Archie Creek Project area are within occupied spotted owl home ranges. The project area has 54 northern spotted owl home ranges. Twenty-seven (27) sites have an unknown occupancy status because survey efforts were not completed prior to the 2020 fires. The BLM completed protocol surveys at 25 of the 54 sites in 2019-2020 prior to the fire event, which resulted in 9 sites with no detections, 5 sites with incidental detections, and 11 sites with occupied status.

95.     The 2016 RMP prohibits the take of spotted owls. The FWS determined that the incidental take of spotted owls is not reasonably certain to occur from the project only if the BLM incorporated certain minimization measures incorporated into the proposed action. These minimization measures largely centered on pre-logging spotted owl surveys to determine whether or not areas were being utilized by spotted owls. BLM has not conducted post-fire owl site surveys, despite the fact that owls will often shift sites or expand use of nearby areas following fires. The BLM's post-fire owl survey effort either has not occurred at all, or the BLM is relying upon passive, audio recording devices. These passive recording devices are not mentioned in the 2016 RMP or the FWS's review of the project. Reliance on these recording devices to establish owl occupancy of sites is novel and precedential. Northern spotted owls will frequently not express auditory cues when their territory overlaps with barred owl territory. Barred owls are present throughout the project area.

96.    Post-fire logging adversely modifies spotted owl habitat. Post-fire logging removes dead, damaged, and dying trees and down logs within the HLB land use allocation inside the Archie Creek Fire perimeter, which are habitat elements important to spotted owls. Typically, salvage harvest removes all or most standing dead trees, thereby simplifying the post-treatment stand condition and future regenerated forest. Post-fire logging can result in large, clearcut openings.

97.    Salvaged areas are expected to resume functioning again as dispersal-only habitat in approximately 40 years, and to eventually develop into nesting, roosting, and foraging habitat in about 80 years, unless harvest units are selected for commercial thinning/harvest in future decades.

98.    The Archie Creek Project will also remove 1,045 acres of green, unburned spotted owl nesting, roosting, and foraging habitat. These 1,045 acres account for over ten percent of the remaining and available unburned nesting, roosting, and foraging habitat for the northern spotted owl in the project area.

99.    In the FONSI, the BLM dismissed these negative impacts that will result from the post-fire logging to this listed species as insignificant "because the Archie Creek Fire Salvage Harvest Plan would not result in the loss of NRF and dispersal-only habitats that support northern spotted owls and overall, the current amount of these habitats and their function is expected to be maintained within the analysis area." This statement conflicts with the BLM's own data that shows the BLM has authorized the removal of 1,360 acres of NRF habitat, 2,685 acres of dispersal habitat, and 1,932 acres of burned NRF habitat through the Archie Creek project. BLM's statement also conflicts with the conclusions reached by the FWS that the Archie Creek Project will likely adversely affect northern spotted owls and owl habitat.

100.    The BLM assumes that the Archie Creek post-fire logging is not expected to change the

site occupancy status or reduce habitat fitness within the 18 sites that were so severely burned

(i.e., < 8 percent NRF remaining in the core and < 10 percent NRF in the home range) because

the BLM is considering those sites abandoned or lost due to the loss of habitat function. The

BLM is not restricting logging activities within these owl sites. BLM is not conducting owl

surveys in these sites prior to logging.

101.    These viability assumptions by the BLM were not generated by field surveys but derived

from satellite habitat data. The 2016 RMP explicitly states that prior to authorizing logging that

could take spotted owls the BLM will "establish whether the northern spotted owl is actually

present in the area that will be affected by the timber harvest using the best available science at

that time, such as through pre-project northern spotted owl surveys." The BLM has not

determined whether or not spotted owls are "actually present" in these 18 sites.

102.    Northern spotted owls generally exhibit high nest site fidelity, and the FWS admits in the

project's Biological Opinion that the "[l]ong-term impacts of fire on owl territories is not well

described," and that "[t]he science related to spotted owl use of burned landscapes is hotly

debated (see esp. Ganey et al., 2017, Peery et al. 2019, Lee 2018 and Jones et al. 2020a)."

103.    In the EA, BLM relies on a single study (Clark et al. 2011) to conclude that owl sites,

even those with documented occupancy pre-fire, are now lost or abandoned post-fire. However,

the FWS explained in the Biological Opinion that in this study (Clark et al. 2011), the "authors

were unable to determine the significance of the effects, noting potential influence of small

sample size and compounding impacts of salvage logging (Clark et al. 2011, pp. 43-44)". In

other words, BLM is relying on a single study that concluded that owl abandoned sites after fires

*followed by salvage logging*, to justify salvage logging these 18 owl sites.

104.    Aside from the nest sites assumed to be non-viable, the 24 sites that were regarded as still viable for use and potential occupation by spotted owls (e.g., > 10 percent NRF in the core), and the other 12 sites where future use by spotted owls is uncertain/unknown, will admittedly experience adverse effects from the proposed action. The BLM admits that occupancy rates declined in burned areas and that extinction rates were positively correlated with the combination of high severity burns and salvage logging. The BLM admits that the Archie Creek Fire Salvage and Hazard Tree Removal propose actions may reduce the likelihood of occupancy by spotted owls in up to 36 sites where salvage or extensive hazard tree removal occurs.

105.    The BLM plans to log within these 36 owl sites, but has proposed a "situational management approach" to design or modify the logging in order to avoid incidental take to spotted owls. The EA explains that this situational management approach depends entirely on spotted owl surveys to be conducted by BLM staff prior to logging. However, the BLM admits in the EA that its "plans to survey the area in 2021 to determine if spotted owls persist at those sites considered viable or where viability is unknown" is "contingent on available staffing." It is possible that logging will occur in these 36 owl sites absent any spotted owl surveys being conducted, thereby circumventing the novel "situational management approach" being relied upon by the BLM and the FWS to avoid take.

106.    In the BLM's FONSI, the agency falsely claims that the project will "maintain habitat features and conditions favorable to northern spotted owls." This contradicts the BLM's own data and analysis.

107.    The FONSI relies upon the fact that the FWS "issued a Biological Opinion stating that due to the minimization measures incorporated into the proposed action, incidental take of

spotted owls is not reasonably certain to occur," despite admitting that these "minimization measures" are contingent on funding and may not occur.

108.    At a minimum, the Archie Creek Project has unknown or uncertain effects to northern spotted owls and relies upon science that BLM acknowledges is controversial. The sheer scope of project effects coupled with this admitted uncertainty is significant under NEPA, which compels the BLM to prepare a full Environmental Impact Statement to eliminate or reduce this uncertainty through actual surveys and site-specific analysis of owl-site effects.

*Fire Hazard and Risk*

109.    One of the management objectives of the BLM's 2016 RMP is to "[a]ctively manage the land to restore and maintain resilience of ecosystems to wildfire and decrease the risk of uncharacteristic, large, high-intensity/high-severity wildfires."

110.    Fire hazard and risk were not issues analyzed in detail by the BLM in the Archie Creek EA, FONSI, or Decision Record.

111.    Instead, the BLM tiered its EA fire analysis to the 2016 RMP Final Environmental Impact Statement ("2016 RMP FEIS"). However, a fire of the size and severity of the Archie Creek Fire was not considered in the 2016 RMP FEIS. Instead, the 2016 RMP FEIS states, "[b]ased on simulations of wildfire occurrence and subsequent savage harvest, salvage harvest would occur on a small acreage under all alternatives and the Proposed RMP (359 acres per year or less)." The salvage logging proposed in the Archie Creek Project far exceeds the modeled assumptions in the 2016 RMP FEIS.

112.    The BLM did not analyze fire hazard impacts at the project level. The BLM analyzed fire hazard impacts across the entire final fire perimeter, which included extensive nonfederal and other federal acreage.

113.    The BLM's proposed action will impact fire hazard on lands within the Wildland Development Area ("WDA"), or areas adjacent to residences.

114.    On BLM lands within the analysis area, 17% of the total WDA is within proposed logging units.

115.    The BLM only considers the impacts of the proposed action on fire hazard on BLM lands within the WDA. The BLM never considers impacts of the proposed action on fire hazard on BLM lands not within the WDA, or the impacts of post-fire salvage logging on intermingled non-federal lands on fire risk, within 83% of the project area.

116.    The BLM assumes that future fire hazard is the same in areas that are salvage logged and replanted versus areas that are allowed to naturally regenerate. The BLM does not provide any scientific support for this assumption. Plaintiffs specifically commented on this issue and provided a substantial body of scientific evidence that specifically refutes this assumption by the BLM. BLM did not respond to this issue or take a hard look at the impacts of salvage logging on future fire hazard.

117.    This assumption is problematic because the current burned and dead trees throughout the project will decay over the next two to three years and dramatically reduce any existing fire hazard for these areas. The BLM states that this existing dead wood poses a high fire risk, but fails to acknowledge this risk will sharply decrease over time if the area is not salvage logged and replanted.

118.    The BLM's EA states that "[n]one of the action alternatives would change the post-fire hazard levels." This statement is unsupported and false. The BLM's FONSI does not address post-fire hazard risks, despite potentially significant impacts to areas adjacent to residences.

*Project Status*

119.    To date, BLM has issued a total of nine Decision Records authorizing fifteen timber sales

pursuant to the Project EA/FONSI. Additionally, the BLM has issued a separate Determination

of NEPA Adequacy and associated Decision Record authorizing a sixteenth timber sale called

the "Sweet Dreams" timber sale. These timber sales will implement a combination of salvage-

logging and hazard-tree removal. Salvage logging units will be essentially clearcut, leaving only

5% (for HLB-MITA) or 15% (for HLB-LITA) pre-harvest stand basal area, or area covered by

trees, with aggregated retention. This will result in large clearcuts with scattered small stands of

trees.

120.    BLM issued all Decision Records in full force and effect for fifteen of the sixteen timber

sales. Accordingly, they became effective on the date signed, and the timber sales were thereby

approved for immediate implementation. Logging is ongoing now and will continue throughout

2022

**FIRST CLAIM FOR RELIEF:**
**FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT**
**(Violation of NEPA and 5 U.S.C. § 706(2)(A))**

121.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

122.    NEPA and its implementing regulations require federal agencies to take a hard look at the

environmental consequences of proposed actions and the reasonable alternatives that would

avoid or minimize such impacts or enhance the quality of the human environment. *See* 42 U.S.C.

§ 4332(2)(C)(i); 40 C.F.R. Part 1500 *et seq*. (1978).

123.    An EA must provide sufficient information for determining whether to prepare an EIS or

issue a FONSI. The information presented in the EA must be of "high quality," and include

"accurate scientific analysis." 40 C.F.R. 1500.1(b) (1978). If the agency chooses not to prepare

an EIS, it must adequately explain, through a convincing statement of reasons, why potential

effects are insignificant in an EA.

124.    If the proposed action may have a significant environmental effect, federal agencies must

prepare an EIS. 42 U.S.C. § 4332.

125.    In determining whether a proposed action may have a "significant" environmental effect,

the context and intensity of the action must be considered. 40 C.F.R. § 1508.27 (1978).

126.    In evaluating intensity, the agency must consider numerous factors, including impacts

that may be both beneficial and adverse; the unique characteristics of the geographic area such as

ecologically critical areas; the degree to which the effects on the quality of the human

environment are likely to be highly controversial; the degree to which the possible effects on the

human environment are highly uncertain or involve unique or unknown risks; whether the action

is related to other actions with individually insignificant but cumulatively significant impacts; the

degree to which the action may adversely affect an endangered or threatened species or its

critical habitat; and whether the action threatens to violate Federal, State, or local law or

requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b) (1978).

127.    If the proposed action may have a "significant" environmental effect according to any of

the criteria, the agency must prepare an EIS.

128.    Additionally, agencies must conduct site-specific analysis before approving a project.

129.    BLM violated NEPA and its implementing regulations through issuance of the Archie

Creek Fire Salvage Harvest and Hazard Tree Removal EA/FONSI and Decision Notice. These

violations include, but are not limited to:

        a.    Failing to prepare an EIS when several of NEPA's "significance" factors are

present. Such significance factors include, but are not limited to: the massive scale and impact of

the project, the logging of ecologically critical areas, including, but not limited to: Late

Successional Reserves, Riparian Reserves, and a designated Wild and Scenic River corridor;

unknown and uncertain impacts in the wake of the 2020 fires; compounding adverse effects to

the northern spotted owl and the removal of critical habitat, unanalyzed and uncertain impacts to

Oregon Coast coho and their critical habitats; the likelihood of a cumulatively significant

environmental impact when combined with past and reasonably foreseeable future timber sales;

and the precedential effect of the BLM's approach for post-fire logging far beyond what was

contemplated in the 2016 RMP. 40 C.F.R. § 1508.27(b) (1978).

     b.   Failing to consider important factors and take the requisite "hard look" at

environmental impacts of the Archie Creek Project, including but not limited to impacts to the

northern spotted owl and Oregon Coast coho and their habitats; the impacts to northern spotted

owl prey such as flying squirrels and red tree voles and their habitats; aquatic impacts such as the

effects to stream temperature and sediment delivery to streams; impacts to wood in streams;

impacts to land slide risks; impacts related to the spread of invasive species; impacts related to

fire hazard and risk; and impacts related to road density and climate change; and

     c.   Failing to provide the high-quality data and analysis necessary to support its

FONSI for the Archie Creek Project. This includes, but is not limited to: incomplete data,

unsupported conclusions or contradictory findings, inaccurate baseline conditions for the project

area, failing to analyze relevant criteria, and the failure to incorporate the best available science.

**SECOND CLAIM FOR RELIEF:**
**FAILURE TO COMPLY WITH RESOURCE MANAGEMENT PLAN**
**(Violation of FLPMA and 43 U.S.C. § 1732(a))**

130.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

131.    Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §

1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a site-specific project conforms to the governing RMP. The Archie Creek project was developed under the 2016 Northwestern and Coastal Oregon RMP.

132.    The Archie Creek project conducts post-fire timber salvage and hazard tree removal.

133.    The Archie Creek Decision authorizes the logging of 2,024 acres of forest within designated LSRs. The Archie Creek Decision authorizes the logging of 1,111 acres of forest within Riparian Reserves. The Archie Creek Project authorizes timber salvage within LSRs and Riparian Reserves to facilitate logging in other land use allocations in the form of yarding corridors/wedges. All trees within yarding corridors/wedges will be cut and removed.

134.    In the Management Direction section for Late Successional Reserves and Riparian Reserves the 2016 RMP states: "Do not conduct timber salvage, except when necessary to protect public safety, or to keep roads and other infrastructure clear of debris." The yarding corridors/wedges in the LSR and Riparian Reserves in the Archie Creek Project will be used to facilitate nearby timber salvage of forests in other land use allocations. The yarding corridor/wedges in the LSR and Riparian Reserves are not necessary to protect public safety, or to keep roads and other infrastructure clear of debris.

135.    The Management Direction section for Riparian Reserves states that BLM may "[a]llow yarding corridors, skid trails, road construction, stream crossings, and road maintenance and improvement where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives." The Management Direction section for LSRs omits this yarding corridor allowance.

136.    The BLM's authorization of salvage harvest in the LSR in the form of yarding corridors

or wedges violates the 2016 RMP. The BLM did not demonstrate there are no operationally feasible and economically viable alternatives to the proposed yarding corridors/wedges in the riparian reserves. The failure of the BLM to conduct this analysis in compliance with mandatory RMP standards pertaining to salvage harvest in the Riparian Reserves and LSR is a violation of FLPMA.

137.    The BLM's authorization of the Archie Creek Project is a violation of FLPMA and is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**PLAINTIFFS' PRAYER FOR RELIEF**

Plaintiffs respectfully request that this court:

a)  Adjudge and declare that the Defendants' approval of the Archie Creek Project violates FLPMA, NEPA, and their implementing regulations and thus is arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

b)  Vacate and set aside the Decision Record, FONSI, and EA for the Archie Creek project, and order Defendants to withdraw the Decision Record, FONSI, EA, and any associated contracts until such time as Defendants demonstrate that they have complied with the law;

c)  Remand the decision to Defendants so it may revise the Project in line with the requirements of FLPMA and NEPA;

d)  Enjoin Defendants and their contractors, assigns, and other agents from proceeding with commercial logging prescriptions unless and until the violations of federal law set forth herein have been corrected;

e)  Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive

relief as may be prayed for hereafter by Plaintiffs;

f)  Award Plaintiffs their costs of suit, reasonable expenses, and attorney fees pursuant to the

Equal Access to Justice Act, 28 U.S.C. § 2412; and

g)  Grant such further relief as the Court deems just and equitable in order to provide

Plaintiffs with relief and protect the public interest.

Respectfully submitted and dated this 8th day of February, 2022.

/s/ Nicholas Cady
Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

/s/ B. Parker Jones
B. Parker Jones (OSB # 191163)
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence Street
Eugene, Oregon 97401
Tel: 541-344-3505
Email: parker@tebbuttlaw.com

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB # 054607)
Western Environmental Law Center
4107 NE Couch Street
Portland, OR. 97232
Tel: 503-914-1323
Email: brown@westernlaw.org

PAGE 35 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to FRCP 7.1, Plaintiffs disclose that they do not have parent corporations, nor do the Plaintiff organizations have stock.